and it's number 18-2574 Fulton v. City of Philadelphia. Ms. Windham, Ms. Isvan, and Ms. Cooper, if you're ready. Good afternoon, and may it please the court. My name is Lori Windham. I represent the appellants, and I would like to reserve ten minutes of my time for rebuttal. Thank you, Judge Ambro. For a century, Catholic Social Services has served the children of Philadelphia, finding them loving families when they must be separated from their parents. Today, the City of Philadelphia claims the right to extinguish that ministry. Our laws and our Constitution were designed to address the needs of a diverse, pluralistic society whose members and their elected officials are not always going to agree with each other. Here, the Constitution and state law... The existing contract between... This is not going to be like an embankment where you get five minutes uninterrupted, so besides that, I'm sure you'd like to have questions anyway. The existing contract's expired. That's correct, Judge Ambro. So do we need to get into the details of the old contractual arrangement or not? Judge, I think that what is relevant here is what relationship that Catholic is asking the court to continue. This is a contract that has been in place for 50 years that has been automatically renewed for as long as anyone in this courtroom can probably remember. And so what we're asking the court to do is to enter relief that would require the city to continue the existing contractual relationship on the same terms that it existed prior to March 15th of this year. And did the FPO apply at that time? No, Judge Sirica, it did not. The city has identified three different provisions or laws that it claims the Catholic has violated. One of those was Section 15.1 of the contract and the Fair Practices Ordinance, which is incorporated into that. Under the Fair Practices Ordinance, the only provision of that which anyone has claimed applies here is the public accommodations provision. But foster care home studies are not a public accommodation. Under state law, foster care providers are required to undergo a series of subjective determinations to decide whether a family is appropriate to care for foster children. This is not the kind of determinations that you would go through in order to buy a bus pass or a hotel room or a restaurant meal. But state law requires a certification before you can qualify. That's exactly right, Your Honor. State law requires the agency to issue a certification that approves or disapproves of a family to become a foster family. And that is a legal requirement for them to be able to have children placed in their home. So can't we just look at this going forward as to whether the city can impose a new explicit non-discrimination requirement in the contract that you would like to enter into? I think that that is one question to look at, Your Honor. But I think that the city's desire to create a new non-discrimination requirement here is evidence of religious targeting. And you can see this if you look at the city's May 7th letter. You've got two conflicting or competing principles. One is non-discrimination, which you see in a host of contracts and ordinances and laws, versus somehow the way I express my religion is being hindered. And how do we deal with it? It seems like over the years the city and Catholic Children's Services has worked it out. I mean, when I look at this case, I see Doe Foster Child Number 1, which may have been the catalyst for the suit that was brought here. They ultimately worked that out with respect to that particular individual. You had the Catholic Social Services in the past asking for a pastoral letter. And there was some pushback, and they said, okay, we'll abandon that. So it seems like people are trying to get together, and I don't know why we've hit this constitutional wall when it appears that in the past no one ever had to get there. Judge Amber, when we first started this case, we were hopeful that there would be some path forward for the parties to be able to work things out. Catholic Social Services doesn't want to be here. They don't want to be in federal court fighting with the city over whether they can continue to serve children. They want to be able to just continue that service and continue working with the city going forward. Unfortunately, the city has dug in its heels and has announced to Catholic Social Services that they cannot continue to provide foster care to Philadelphia children unless they are willing to make certifications that violate their faith, unless they are willing to comply with what the city now claims they can't serve. Which I think takes us back to Judge Sirica's question. You've got a proposed contract for a certification that's required by the state, and I think the state also requires nondiscrimination. And what you're doing is you're carrying out the evaluation, the report that the contract requires. How is that a violation of Catholic Social Services' religious expression? In a couple of ways, Your Honor. It is undisputed what the legal requirements are for that certification, what the legal effect of it is. Under 55 Pennsylvania Code 3700.64, an agency shall consider existing family relationships, attitudes, and expectations regarding the applicant's own children, ability of the applicant to work in partnership with an agency, among other considerations. And the outcome of that decision is a decision to certify and approve or disapprove a family to be foster parents. Catholic was also quite clear, testifying at the hearing, that they understand this certification to be an endorsement of the relationships in the home. And you can see this in the record at page 312, providing a written certification endorsing a same-sex marriage would violate the religious exercise of Catholic Social Services. On page 389, it is Catholic's sincere belief that a final home study includes a written endorsement of any relevant relationships of the foster parents. So, okay, that's the argument. How is this endorsing same-sex marriage? I mean, you're doing a report. They're undertaking a subjective consideration of the relationships within the home. They are then providing that family with a certification saying, yes, we have approved this family to serve as foster parents. That's something that Catholic, because of its religious beliefs about marriage, cannot do. I would also note, Your Honor, my understanding is that a single gay person would not be turned away. Is that correct? That's correct, Your Honor. They're only required to consider the relationships of the adults in the home. And so if there's not another adult who's living in that home, there would be no reason to have to endorse or certify any other relationships. You say this is endorsing, and you would be endorsing. But I'm missing the analytic path that gets you to unconstitutional action here. Where do you fit? Are you talking about free exercise? Are you talking about establishment? What are you talking about? And how do you get there? That's a great question, Judge Rendell. I think the question of endorsement goes to two claims. It goes to the free exercise claim, explaining exactly what the religious exercise here is that is being restricted. It goes to the Pennsylvania RFPA claim. Let's talk about free exercise. Under Smith, if there is a generally applicable neutral law, and that's what this is, how can you contend that there's a violation of free exercise? Your Honor, this is not a neutral and generally applicable law. Isn't it being required of every contracting party? And so your argument, as I understand, are you referring to 15.1 of the contract in the Fair Practices Ordinance as a neutral and generally applicable law? Yes. The one that says you have to sign a nondiscrimination, you have to agree to nondiscrimination, yes. And so the nondiscrimination provision the city is talking about only applies to public accommodations. Catholic is not a public accommodation. Catholic is not a public accommodation. Because a home study certification is not a good or service that is generally available to the public. Its purpose is to be selective. Even if Catholic were a public accommodation. Well, then if someone is a hotel and the service is to just provide lodging that's very selective, is that not a public accommodation? We certainly agree a hotel would be a public accommodation. Right. It's just a single focus. It's providing overnight accommodation. Why is that not the same as your argument that you're limited? Because what Catholic is being asked to do here is to engage and what all foster care agencies are being asked to do here is to engage in a selective process and to look at things that are- How does that not fit within the definition of public accommodation? Because there- Does it exempt selective processes? It refers to things that are generally open and available to the public. Even if it were- All facilities of any services provided, all kinds of public service acts. I'm just trying to figure out which component here is lacking. Judge Rendell, even if this were a public accommodation, the city- It is not neutral and generally applicable because the city is creating exceptions to it. It's permitting exceptions to it. The city says that it expects foster agencies to follow state law. What does state law tell you to do? It says you shall consider existing family relationships. You shall consider demonstrated stable mental and emotional adjustment, including perhaps a psychological evaluation. Those are exemptions? Those are things that need to be considered. Those are things that need to be considered, and so you have a situation where the city is suddenly saying now- There's no evidence that they had previously considered this to be a public accommodation. But that doesn't matter. But it suddenly- They're all of a sudden requiring it of everyone. It doesn't matter that they didn't require it of anyone, does it? Yes, because it determines whether they have a neutral and generally applicable law and whether they're engaging in religious targeting. What the city is doing here is it's saying on one hand, well, we expect you not to consider familial status, marital status, disability, including mental disability, and on the other hand, they're saying you must follow a state law, which doesn't just allow you but requires you to consider marital status, familial status, and mental disability as a part of making these determinations. And so this law here is not neutral and generally applicable. Even if it were, the city would still have to. I don't know how that detracts from the neutrality and the general applicability, the fact that they are saying certain factors need to be considered. Because it applies to religious and secular alike, does it not? It applies to-if it applies at all, it applies to religious and secular alike. But what the city is doing is, on the one hand, saying you can't look at these things in public accommodation, and on the other hand saying you have to follow a state law that requires you to look at these things even if you are a public accommodation. And so this is not neutral, not generally applicable. Before this came up as an issue over all these years, what happened in the past when there was a report done? I take it they never went into a same-sex marriage home or what? No, Your Honor. The evidence shows that there is no same-sex couple who's ever approached Catholic Social Services to request a home study. And there's no one who's ever even come knocking on their door seeking this service from them. Therefore, there's no one who has actually been harmed by the city continuing to work with Catholic Social Services to place children in loving homes. Even if this court were to think that there were a neutral and generally applicable law that applies here, the city is still compelling speech by reaching outside of the program that it is actually funding and attempting to compel Catholic Social Services. Let's go back to Judge Sharika's question, then you would still do a report if there were a LGBT person in the home, would you not? If it were a single LGBT individual, yes, they would still issue the report. But the Church has views on that. But the Church is not being asked by the state law here to issue an opinion on a person's sexual orientation or their relationships with people outside of their own home. They're merely being asked to issue a written certification and an endorsement for the relationships of the adults that are in the home. And this was something that was discussed for quite a bit at the hearing. And so this issue only comes up when you have a couple who is in an unmarried relationship or a same-sex relationship who comes in seeking a certification and an endorsement under state law. So what happens if you have a person who's gay who wants to be a foster parent, has done so in the past and has done a good job, and that person is not married but is clearly living with a significant other? What do you do then? In that case, Catholic would refer that couple to any one of the 29 other agencies who would happily serve them, just as they would with an opposite-sex, unmarried couple. And what has been the city's response to that? Your Honor, the city's response is what we have heard and what we will hear today. The city has not taken any action against Catholic or had any complaints that we're aware of against Catholic on this issue until this issue came up in March of this year. Do you propose, though, a change in the contract whereby all you would do would be referring those that you felt within your religious beliefs you couldn't address from a relationship standpoint? In other words, you say to them, listen, we'll sign this contract, but it's understood that when someone comes to us, let's say same-sex marriage, we'll refer that out. Your Honor, we believe that that is the way the contract worked today, and so we have no objection to entering into a contract that would allow Catholic to continue to have that religious practice of making referrals. So the city's interest is the stigmatization of LGBTQ individuals? Yes, Your Honor, this is the interest. Is there any other response by the city with respect to what you just said? With regard to why? The reason why they've – does your response answer the city's concern that it's stigmatizing certain individuals by not – by allowing you to make a referral? I believe it does, Your Honor, and the Supreme Court addressed this in Masterpiece, where it recognized that there were certain situations where, for example, if a member of the clergy was unable to solidnize a same-sex marriage, this would be an exercise that gay persons could recognize and accept without serious diminishment of their own dignity and worth. And it recognized that you could have a situation where you would have too many such exceptions. You might have a long list of persons, but here we don't have that. Here we know that 29 out of 30 agencies will provide these home study certifications. So we're talking about one agency that the city is attempting to shut down simply because of its religious practice. Well, they haven't shut down the aggregate care. Or the CUA. Or the CUA, is that right? That's correct, Your Honor. I'm not aware of any case, and the city has not cited any, that say that it's okay to burden one part of a person's religious exercise and extinguish one part of that exercise as long as you don't do it all at the same time. The Supreme Court in Holt noted that it was a substantial burden on Mr. Holt's religious exercise when he was prohibited from growing a half-inch beard, even though he could still engage in practicing his faith in other ways. I think it's particularly troubling here, given the evidence that we have of targeting on behalf of the city. Now, what about that evidence? Now, the district court made a finding that there was no targeting and no motivation, no anti-religious animus, if you will. And that's a finding of fact. So that's subject to clear error review when it comes to us. How do you satisfy that standard, that it was clearly erroneous on the part of the district court? Your Honor, under Brown v. City of Pittsburgh and the Borough of Tennessee case, this court considers factual findings by the district court in a free exercise case or First Amendment case differently. It conducts an independent review of the factual record. So is that a de novo or abuse of discretion, or how? What the statement says is an independent review of the factual record, which I would analogize to de novo review. So how should we look at it differently as far as you're concerned? What is it? What's the smoking gun here? What's different about this case is that you have a whole series of actions which all targeted Catholics' religious exercise. You have the commissioner's statements that it's not 100 years ago and a Catholic needs to follow the teachings of Pope Francis. You then have the referral shutdown that came minutes later. You have PCHR, which ignored its own due process regulations in instituting an investigation of Catholics at the behest of the mayor. You have the mayor's public statements criticizing the archdiocese. You have the city council. So the mayor's comments were temporarily far removed from this action. How do you align them? We do know that the PCHR acknowledged this investigation was coming at the request of the mayor. But we do have something that is much more temporarily close, which is the city council resolution condemning discrimination under the guise of religious freedom was what they phrased it. It's very similar to the sort of statements that the Supreme Court found in Masterpiece demonstrated that Masterpiece did not receive the neutral and respectful consideration to which it was entitled because it treated religious exercise as something insubstantial and even insincere. So what did the ordinance provide specifically that you're relying on here? I'm sorry, which ordinance are you referring to? You said there was a city ordinance that was hostile. This was a resolution by the city council which directed DHS to conduct an investigation and also called upon them to terminate any contracts with such organizations with all deliberate speed. And we see that the city did just that immediately, ending referrals under the contract and now asking that it be permitted to terminate that contract altogether and no longer renew it. We focus a lot on free exercise, but I do have just a moment and I want to talk about compelled speech. The city is reaching outside the scope of the contract and the scope of the contracted force services and trying to compel Catholic to engage in speech which it understands and which state law says is an endorsement of relationships, an endorsement it cannot make. Even if this were purely factual information, we know under the Supreme Court's recent decision in Nifla v. Becerra that this can still be compelled speech by the government. How is it compelled? It's understood that the Catholic Social Services does not believe in condoned same-sex marriages. And why not do the evaluation report with, in effect, a caveat? We're doing this pursuant to our contract. We do not believe that this comports with the tenets of the way we understand Catholicism, period. You're not compelled to speech of any kind. Your reservations are completely stated openly. And, in effect, that today is what Bethany Christian is doing. Two points on that, Your Honor. With regard to Bethany Christian, I believe this gets a little bit into what the Supreme Court said in Thomas v. Review Board, where it is not the job of the government to determine who best perceived the commands of their common faith. But I would also note that the solution that you're suggesting, where you just say, yes, we approve this, oh, by the way, we don't approve of same-sex marriages, is essentially what the Supreme Court said was not acceptable in Nifla. There you had pro-life pregnancy centers who were required to have a government-mandated statement. And the government-mandated statement said that other services was available, here's where you could access them. Nifla was free to then go and have a sign right next to that saying, we think abortion is a bad idea, don't do it. And yet the state was still requiring that these hell women, where they could go to get an abortion. And the Supreme Court said, no, you are still compelling their speech. Here it's different. You're doing a report based on someone else's criteria. If you were doing this alone, this was solely under your aegis, you would not do it, and you make it clear that if this was yours alone, you would not do it. Or the flip to that is you've set conditions on us that we don't like, they're required for both the secular and the religious, we don't like it, and we're opting out. It's your choice. In that case, Your Honor, I think that this still runs headlong into the Supreme Court's compelled speech precedence. This would be as if in the AOC case, Alliance for Open Society International, the agencies had to adopt an anti-prostitution policy, and they could just say, okay, the government made us do it. We don't really like this. That's being forced to do something that's against it. Isn't that different than this? Actually, all you're doing is following the procedures others have selected for its criteria, and you're going along with that, even though if you were in charge, you wouldn't do it. How does that fit with that particular case? I think two parts on that. Your Honor, number one, under the Pennsylvania Code, this is not a checklist where you just say, check, check, check, check, check, okay, you fit the boxes, here's your certification. This is actually subjective considerations that an agency has to engage in. They must consider a number of different things, and there's no if this, then that statement in the Pennsylvania regulation. Well, they added a few things, like the pastoral letter. But they said, okay, we'll back off from doing the pastoral letter. You've objected to it. I keep coming back to what Judge Tucker said almost at the outset. This is cries for some type of resolution done between Catholic Social Services and the city, and my guess is it's been done like this for a long time. Your Honor, my understanding is that it has been done like this for a long time, and I'm not sure why the city has chosen to dig in its heels now, but it has. It has done so in a very public and very open way. If it were to exempt you, then it would be preferring religion. So as long as it's generally applicable, they're not digging in their heels as much as they're applying it to everyone, and you happen to be in that group. If they were to exempt you, then they'd be establishing religion. Certainly not, Your Honor, because this would then fall under the Supreme Court's precedence in Amos and in Qatar, where the court has recognized that, in fact, it is permissible to accommodate religion even beyond that which is strictly required by the Free Exercise Clause, and the government can do that without violating the Establishment Clause, as this court recognized in Real Alternatives. Even when noninterference is not strictly required, the government has discretion to grant certain religious accommodations subject to constitutional limitation, and we've explained in our briefing why we believe that the accommodations that Catholics would receive here are not violating the Constitution, because they exist within a system of true private choice within which LGBT families have a free choice among 29 different providers who they would be able to go to and be able to access these home study services. Is there a syllogism at play here? The city is going after us because we discriminate. We discriminate because of our religious beliefs. Therefore, the city is going after us because of our religious beliefs. Your Honor, I'm sure that that is what the city would say. What would you say? I mean, how do you play out this theme? Your Honor, first of all, what I think you're asking here is that Catholic understands that its religious beliefs are not just something that sit alone and exist quietly within the church. They're something that they have to go out and live in public. That's why they're engaged in foster care in the first place, because their faith requires them to, and this is why the individual foster parents like Ms. Fulton and Ms. Sims-Bush are out there serving. They said it was a religious calling. And so the city is putting Catholics to an impossible choice. It's saying if you want to go out and live out this part of your religious calling and your religious mission, you must do so at the price of making certifications that violate your religious faith. But what are the consequences if we go your way? What happens to the Smith case, going back to the very first question of Judge Rendell? You have a neutral law of general application. That's going to be upheld. What happens if we go your way? What happens to Smith? Your Honor, we have explained at length why we believe this is not a neutral law of general application and why this is also religious targeting. If you look at the Masterpiece case, what the Supreme Court said in that decision is that it was undisputed that Masterpiece Cake Shop was subject to the public accommodations laws of Colorado. That was not an issue in that case, and even so, the way the government had targeted that religious practice and that religious individual, the fact that it did not receive the neutral and respectful consideration to which he was entitled was still a violation. The very decision-making of the commission reflected that hostility. The actual decision of the commission in finding that it violated the law was totally hostile to religion, but we don't have that here. Your Honor, the decision-making has been from DHS, and there are statements by DHS disagreeing with how Catholic understands its religious obligations. We have the statements of city council. We have indications from different parts of city government that Catholic was not receiving neutral and respectful consideration to which they were entitled under the Supreme Court's decision in Masterpiece. So are you conceding general applicability and public accommodation in this matter? Not at all, Your Honor. I'm simply making the point that even if this court were not persuaded on the points of general applicability and public accommodation, that that would still not answer the question, because under the Supreme Court's Masterpiece decision, when there is religious targeting involved, even when you have something that might be a generally applicable law, there might still be violations of the Free Exercise Clause, and we believe that's exactly what's happened here. What would happen if someone opened a hotel and they said that it was part of their religious mission that only whites could be there because they believe in white supremacy, and so they have to operate the hotel to fulfill their religious calling? It has to be whites only. What's the government's interest then? The government's interest in non-discrimination. What would happen in that case? In that case, the government would win for a couple of different reasons. Number one, you have a group that's coming in and asking to violate something that is unquestionably a public accommodations law that applies to them. Number two, the government has a compelling interest in eradicating racial discrimination under the Bob Jones case, and so even in the unlikely event you've got the compelling interest there, the government would win that case. Here, I think it's important to look at the history and to understand the history. We're not talking about somebody who's come in and said, we want to set up some new establishment in order to discriminate. We're talking about an organization that has served Philadelphia children for a century. We're talking about an individual... We're saying that there are certain people or certain groups that we will not serve in this capacity. Maybe it's choosing, so it's... I'm not saying pejoratively discrimination, but it is discriminating with a small d, is it not? It is refusing to make certifications that violate their religious beliefs. They're not saying we can never work with LGBT foster parents, and in fact they've said they welcome children regardless of their sexual orientation and are happy to serve them. They're simply asking that in this one small way they be permitted to follow what their faith requires and be allowed to make referrals to other agencies. So I come back to one of the questions I asked earlier. State it another way. Isn't this a straightforward application of participation in a public program? You just don't have to participate if you don't agree. There are a couple of different problems with that, Your Honor. Number one is the fact that the city now effectively occupies the field. And so this is not a case where Catholics... This is not a case like the AOC case where you could say, we don't want that government grant. We're just going to go over here and keep doing our work without it, without a contract with the city of Philadelphia. The city and the state occupy the field. I'm sorry? The city and the state occupy the field. Yes, that's correct. The city and the state occupy the field. But without a contract with the city of Philadelphia, Catholics cannot provide foster care to the children of Philadelphia. So that's off the table. Number two, if you look at the Supreme Court's decision in Trinity Lutheran, they were clear that even within the context of a government grant program, the government cannot discriminate according to religion. And so in the city, the Supreme Court, in making that decision, cited to the Associated Contractors of Jacksonville case, so acknowledging that this applies to government contracts as well. So the government is not getting a get-out-of-the-Constitution-free card simply because they have a contract. All right. We'll hear back from rebuttal. And Ms. Sissman, you would be first? Jane S. Vann and I represent the city defendants. Judge Ambrose, I'd like to start out picking up on some of your points. I know you've expressed some concern that we should work this out. And I will say the trial court credited the fact that we do have a strong desire to continue the contract. Everything in this record demonstrates that. But it seems to us that the only thing that Catholic will suggest is that they should be allowed to operate on this so-called referral system. And respectfully, you suggested that that might have been going on for a time. And respectfully, I'd like to push back on that a little bit and just say there's no evidence in the record that we knew that Catholic was willing to turn away otherwise qualified same-sex foster couples until the inquiry. And I'd also just like to point out that with respect to the pastoral letter, that's something that we didn't become aware of until the hearing, until the hearing itself when there was some testimony on that point. All I'm saying there is when you objected, they did back off, as I understand. Yes, Your Honor. They did write a letter to Judge Tucker and state that they would no longer enforce that. Do we need to get into the details of the old contract? It's our position that we don't. As we explained, this case is about prospective relief. This case is about what we ask them to do going forward with the new contract. And as our May 7th letter demonstrated, what we told them is we obviously have a disagreement about what the old contract required. We believe that whenever you're a contractor with us and you sign a commitment that you won't discriminate, that that means that when you're serving the public you won't discriminate. Nevertheless, we have a disagreement. But going forward, we need everyone to commit that they will treat all otherwise qualified prospective foster parents equally and not discriminate against them on the What about a referral system? Would that work? But if there is something you believe violates your religion, will it permit you to refer the suitability of that couple to another entity? No, Judge Rendell, that wouldn't work for several reasons. And we went over a couple in the brief. I guess the first thing I want to explain is that it seems to be suggesting that there should be a mandated conscience clause. They seem to be invoking the notion of a conscience clause where, for example, a pharmacist can refuse to provide reproductive services to a client and refer that person to another pharmacist, which meant that in the context of discrimination, it's a completely different animal. It would be like saying that if a Christian restaurant owner doesn't want to serve a Muslim, that that's okay because that Muslim can walk down the street and 99.9% of the restaurants in Philadelphia would serve them and there would be basically no imposition on them. So it's our position that it simply doesn't work. Second, we also addressed in our brief the stigma point. And the stigma, I just want to emphasize, the stigma isn't just to adults. As the commissioner explained very eloquently during the hearing, it's a stigma that we have to be concerned about with respect to the LGBT youth in our care because it sends a message, we're okay with you now, we're protecting your rights now, but when you grow up, we're going to contract with someone who assesses that you're not good enough to have a family. And that was very concerning to the commissioner because we have a mission to serve all youth. The city has entered into, what, 29 other contracts for foster care, is that right? Yes, Your Honor. Do all of them contain language regarding discrimination against same-sex couples being prohibited? They all contain the sexual orientation provision. The clarification that we talked about is outside the record because the contracts all went out after the hearing. But the commissioner did testify at page 617 of the record that the new contracts were going to go out with this clarification. But as I stated, it's our position that if you go back to the prior contract, that there's no reason why these providers shouldn't have considered themselves to be a public accommodation. And we're contracting with them to provide qualified foster parents for us, that they should assume that when they're selecting those foster parents, that they should not be turning people away solely on the basis of their protected characteristics. It seems to me one of the key findings here was the finding regarding targeting. And under Tenafly, we look at the record anew. We're not confined to clear error. So the commissioner's statements about the Pope and 100 years, why wouldn't we not view that as hostility somewhat akin to what happened in Masterpiece? Judge Rendell, as we explained more thoroughly in the briefing, I'm happy to go over all those points now, it's something that neither in Lukumi nor in Masterpiece did the court focus solely on comments and decide that was enough. They looked at those comments in the context of the particular case. All right. We'll look at the comments in the context of the case. Right. And so in those cases, it was persuasive for the courts, not just that there were troubling comments, but that there was action on those comments because this is not about civility, this is not about being nice to each other, this is about determining whether the decision maker is actually acting neutrally. And so in both of those cases, it was determinative that there was evidence that when there was a secular incident that was similar to the religious exemption that, for example, the Baker in Masterpiece thought that the Colorado Civil Rights Commission said, you're okay. And that was incredibly troubling to the court. And it was the same in Lukumi where the court basically held that the statute of issue had been religiously gerrymandered, such that basically the only type of animal slaughter that was prohibited was animal slaughter performed by members of the Santeria religion. So you're saying the targeting, it's not comments alone, it's if the targeting causes the entity to act in a manner that actually targets in terms of the decision, treating it differently. And here you're saying since the policy is across the board against everyone that the targeting really doesn't, the hostility isn't the same as in those cases? Yes, Judge Rendell, and I can't emphasize enough that there's no evidence in this case that we've ever permitted a secular excuse for violating non-discrimination requirements. And I'd also like to point out that just the factual context of this case is kind of the exact opposite of a situation that's hostile. We're looking at a situation where we've had a long-time relationship with Catholic social services in spite of their well-known views on same-sex marriage. And yet that relationship has still been fruitful. And, in fact, we continue to contract with them with respect to the more lucrative aspects of their contracts with us. And so to infer that somehow there was something hostile going on just doesn't make sense in light of the record. And this issue does not come up in the congregate care area? No, it doesn't, Judge Shurica. Those contracts moved forward. I believe that's in the record, but I know that they did move forward. And I also just wanted to point out just a couple more things. One other thing. I'm sorry. If you're affirmed in this, we're on a preliminary injunction here. Yes. Do you intend then to go back to the district court? Sure. I mean, we're the defendants, so we have to – we're guided by however Catholic social services wants to proceed if we go back. In connection with the comments that were made by Commissioner Figueroa, what's your response to – you should act more like Pope Francis, sort of. It's almost like the Jesuit side and the more conservative side and in Tenafly we had a bit of the same thing, the same religion, but very different groups with different views. Yes. And I'm glad that you brought us back to that, Judge Ambrose, because the other thing I was going to point out is that her comments were completely different in character from what you see in cases like Lukumi, Masterpiece, and even Tenafly. I think where you have some – where you have just denigration and disrespect for the religion itself and questioning of the justification. None of that was present here. It's a completely different circumstance. And furthermore, it's important to take note of the fact that this occurred in the context of contractual negotiations. It wasn't a neutral adjudication. And while certainly our city officials shouldn't be acting in a biased manner, it was a situation that was much less formal, and it was a situation, obviously, where you're trying to persuade someone, and I think that's the context in which you have to look at that comment. It's trying to persuade them that it would be okay to come around to our position. I did want to swing back for a moment. Actually, I had a third point on referrals today because I know that it came up in your conversations with Ms. Windham about how there's 29 other providers and people can be served. And I know that CSS has claimed in their brief that we're claiming it's somewhat speculative that we will have a situation if they're permitted to take a religious exemption whereby others would take the same religious exemption. But I would submit that it's not at all speculative. And there's a couple things in the record on that. First of all, the pastoral letter, which demonstrates that Catholic has already attempted to operate in such a manner by which it only serves believers. And furthermore, the interveners noted a couple of situations as to the amici where we have Christian providers in other parts of the country that have determined that they can only serve Christians. CSS wants to analogize this to a private choice type of situation where we have different providers serving different kinds of people. But, again, we submit that that's permitting discrimination and we simply don't have to allow that. We haven't heard anything about the Pennsylvania Act. Any comment that you would like to make about that? I'm sorry, District, about the regulations? Yes. The RFPA. The RFPA. Oh, the Religious Freedom Protection Act. I know, Ms. Windham, that there was a little bit of commentary about the fact that they're entitled to a contract and that it substantially burdens their religious exercise because they otherwise can't do this work because we occupy the field. And I submit that that's just a completely novel, unprecedented approach to free exercise and to religious freedom jurisprudence. Religious freedom jurisprudence looks at the extent to which we're interfering with your private exercise of religion. Nothing about the free exercise clause entitles you, says that you have an entitlement for the government to give you something in order to exercise your religious rights. And it's our position that that would certainly be the case here. In addition, on the RISPA claim, we also don't... Let's go back to the RFPA. Yes, sir. I mean, I think the argument being made is they're being put to a Hobson's choice. They have to refrain from conduct that's mandated by sincerely held religious beliefs or engage in conduct or expression that violates the tenets of their faith. But as you pointed out yourself, Judge Ambrose, this is in the context of a contract. No one's forcing them to do this. They can simply walk away from the contract or they can persuade us that we're wrong. It's not a public benefit. Exactly. Exactly, Judge Randolph. How about compelled speech? Do you want to address that, their view that this is compelling speech? Sure, absolutely. I've never quite understood their argument because... And Ms. Windham was talking about Becerra. Becerra's not a case about a contract. And it's clear in the situation of a contract, going back to the AOSI case, that if your speech is in the context of the contours of the contract that you're executing for the government, that we can impose conditions on that. It's not unconstitutional. And here we're talking about a contract by which they've agreed to provide us with qualified foster parents to take care of the children who are in our custody. In order for them to get those foster parents qualified, they need to write that piece of paper, the home study, or however you want to characterize it, and turn it into the state in order to get these parents certified. So the execution of that piece of paper is within 100% within the terms of the contract. So we just don't see how they avoid case law like that. In addition, and we touched on this a little bit in our RIFPA argument too, it's also hard to see how it's a burden for them and where the speech comes in regarding same-sex marriage, where, as Mr. Romano admitted himself, the Commonwealth doesn't require you to certify that people are married when you write that piece of paper and turn it in and get someone qualified. We're not asking them to not write op-eds in the paper. We're not asking them to give up their views. We're not asking them to write a policy statement, as occurred in the AOSI case. We're simply asking them to file this piece of paper to get these people qualified. It's essentially a self-imposed burden in terms of endorsing marriage where the state itself doesn't require that. Thank you. Thank you. We'll hear from Ms. Cooper. Good afternoon. May it please the Court. I'm Leslie Cooper with the American Civil Liberties Union representing the Intervenors Support Center for Child Advocates and Philadelphia Family Pride. CSS here is making an extraordinary claim, unsupported by any case law. Let me ask you something I haven't asked either side. Analytically, which test do we go about? Do we resurrect, I suppose, Lemon, or is it the endorsement test, or what? For our establishment clause position? Well, I think, as an initial matter, the Court doesn't need to reach the establishment clause argument that intervenors have made because there is no basis for the free exercise or free speech or RIFPA claims that were made. But if we want to turn to the establishment clause, I think this Court has continued to apply the Lemon test over the years. Sometimes it talks about endorsement. Sometimes it talks about the Lemon III prompt test. There's an argument that, well, it's Lynch v. Donnelly or whatever. It really just takes the second part of the Lemon test, the endorsement, and that's the law. And I think either way— Lemon's never been technically overruled. I'm sorry? Lemon's never really been overruled. That's right. That's right. I think that that's the way I read it, and I think that no matter how you configure it, again, I don't think the Court needs to reach this question, but allowing the use of religious eligibility criteria in a public program, a government service, violates the establishment clause under any of those configurations. The government itself could not have religious eligibility criteria for foster families, couldn't say no gay couples because of religious objections, no Jews, no Christians. Excuse me? What's being done here is forcing them to, in effect, endorse something that they don't believe in. Well, nobody's being forced to endorse anything. There's no right under the Free Exercise Clause or any other constitutional provision to a government contract to perform a government service and to do so in accordance with your religious beliefs and override the policy decisions of the government that's hiring you to perform that government service. That was the tone of some of my questions to the other side. That was the tone of some of my questions to the other side. I think so. But I do think it's important to think about the implications of their argument, if accepted here. If, in fact, the right to free exercise entitles someone to a government contract to perform government services on terms that violate the government's policies, just because the organization or the entity has a religious objection to complying with those policies, the consequences would be endless and staggering. The government would have to abandon not just sexual orientation, non-discrimination requirements, but any non-discrimination requirements that any agency felt intruded on their religious beliefs. In fact, it was precisely concern about discrimination against people because of their faith, especially religious minorities, that animated a strong outpouring of amicus support for the city on the part of a very broad spectrum of faith leaders and organizations. Well, if they were going to abandon the anti-discrimination clause, they'd have to do it across the board, wouldn't they? I mean, if they exempted CSS, then that would be a form of establishment, would it not? I think if they were to say that CSS could use this religious criteria, and in this case it happens to be a religiously motivated exclusion of same-sex couples, they've abandoned their other or at least some of their other religious criteria. Right, the city, if it were to allow that, it would have to allow any agency that has any religious objection to any class of people, whether Jews, Muslims, non-Christians, people who are in interracial relationships. And I would say I don't even see how it could be cabins in non-discrimination law. It seems if you have a free exercise right to opt out of a government contract requirement because it doesn't match your religious beliefs, I don't see why that wouldn't apply to any contract requirements. So, for example, here, taking the child welfare context that this case arose in, if there are family reunification services that agencies provide, that would mean an agency could say, I'm not going to provide family reunification services for that child because I have a religious objection to their family of origin. And we can't even really cabinet to the child welfare system. If there is an entitlement under the free exercise clause to dictate the terms of a government contract, if you're a faith-based organization, that would seem that there would be no line to draw to limit that to the circumstances of this case. We, interveners, have been talking about these extensive implications since the district court, and CFS still has not said whether it believes that government contractors with religious objections to complying with other non-discrimination requirements should get the same, or any other requirements, should get the same treatment it seeks for itself, a right to opt out. They've offered no basis to cabinet the legal argument to the circumstances of this case. The only thing they said about that in their reply brief, I believe, was that we've identified various harms, but they have not occurred despite the fact that many states have RFRAs and laws specifically allowing child welfare providers to discriminate based on religious beliefs. Well, no court anywhere in this country has ever held that any RFRA authorizes faith-based agencies to opt out of government contract requirements to provide government services. We will not see the impact of such a ruling, or such a rule of law, on the ground unless their extraordinary interpretation of the right to free exercise of religion were accepted by a court. And to be sure, in states that have authorized religiously motivated discrimination by state-contracted child-placing agencies, as we discussed in our brief, a number of those agencies are not just limiting eligibility to heterosexual couples. They are limiting eligibility to people of their own faith, Christian or a certain form of Christian. So the implications, there's really no way to give the relief to CSS that it's seeking without opening a door to allowing any kind of government contractor to opt out of any government contract requirement in the provision of a public service. And that's what makes the case, I think, so extreme in this context, that we're talking about a city providing child welfare services to wards of the city. Children, the city has an obligation to care for because the city has removed them from their families because they couldn't remain safely there. The city has made the reasoned determination that it's good for these children to have all good families that can care for them, take care of them, and they have a need for families to take care of them. There is nothing about the free exercise clause that requires the city to be forced to abandon that very critical child welfare policy judgment and allow agencies to turn away qualified families. There's nothing in the free exercise clause or the Pennsylvania RFPA that gives anyone a right to a taxpayer-funded contract to provide that government service. And the Supreme Court has made clear in cases like Rust and Locke v. Davey that there's just no right to government funding of a constitutionally protected activity. And the only cases that have addressed claims anything like the one CSS is making here are the Sixth Circuit decision in Teen Ranch and more recently a federal district court decision in DuMont in Michigan where those courts clearly rejected the idea that faith-based agencies can opt out of government contract requirements or are entitled to a contract that meets their religious standards. And I want to say just a few comments about the CSS argument that you can't provide foster care without a city contract, therefore their ministry is effectively being extinguished is the way they put it. I think this is a remarkable argument because I think they're saying if an organization says we have a religious belief that we need to provide a particular service that is only one the government provides, that we have to be given the right to do that even if we're unwilling to follow the policy decisions of the government and violate those government policies just to accommodate our religious beliefs. If somebody had a religious belief that they need to provide firefighting or police services, I just don't think there would be a right to provide that services in violation of the police department's policies or the fire department's policies. And again, when we're talking about wards of the state, the city cannot be required and the Free Exercise Clause certainly does not require that the city has to surrender child welfare policy judgments it has made about how to properly care for wards of the city to accommodate an agency's religious belief that it wants to provide care for them. I do want to talk a little bit about the claim of religious targeting because it felt like in CSS's argument that perhaps they were accepting that absent a claim of anti-religious targeting, their claim would not survive, that there's just no free exercise right freestanding to get a government contract that lets you provide government services how your religion would do so. The targeting, I think the district court found based on a very clear record that it makes no sense to say, as CSS claims, that the city decided to close intake and decided not to offer a new contract in order to punish CSS for its religious beliefs about same-sex marriage. It makes no sense because the city has long known about CSS's religious beliefs about marriage and that never stopped the city from partnering with CSS and they continue to provide something to the tune of $17 million of contracts, child welfare services with CSS to this day. The city did not close foster care intake to CSS when it learned of CSS's religious beliefs. It closed intake when it learned that CSS is unwilling to comply with its child welfare policy of not turning away families based on any protected characteristics. Anything to sum up? I want to say one small thing about something made on the establishment clause. Again, I don't think there's any reason for the court to reach that, but the private choice argument that the other side has articulated, this is nothing like Zellman or the vouchers cases involving private choice. This is the opposite of private choice because this is government services for children who have no choice in the matter. They don't get to raise their hand and say, I want to make sure that all the decisions are made based on our interests, not the agency's religious beliefs. But even if you focus on the prospective families, unlike in Zellman and the other cases about private choice that they cited, you can't say here there's no harm because families have private choice. Here it's the opposite. They don't have private choice. Same-sex couples can't choose to go to any agency. And even if these agencies were all fungible, that would be a harm. That some set of people get a choice of 30 agencies, another class of people gets fewer. Imagine if Christians get 30, Jews, Muslims, everyone else gets some fewer amount, et cetera. That would be a harm in and of itself, even if they were fungible. But they're not fungible, as CSS is the first to point out. They have different services they offer families. They have different expertise with respect to the care of populations of children. So that means that if, you know, for example, medically needy children, if a family headed by a same-sex couple would like to care for a medically needy child and if the city were to accede to CSS demands and allow any agency that wants to discriminate to do so, that family may no longer be able to go to the agency that would make sense for their circumstances. That means fewer families potentially for children. So the city sort of pivots to the city's very compelling interests here. There's no reason to get to strict scrutiny, but even if the court needed to for any reason, the compelling interest in eradicating discrimination, the Supreme Court recognized in Masterpiece that that harm of discrimination is no less when the discrimination is based on sexual orientation. And the children having the city's compelling interest in making sure that families are not turned away for reasons unrelated. Assuming that is a compelling interest, is this the most narrow way to attack it? Absolutely, because the idea of referring to other agencies or pointing out, as CSS does, that there are other agencies that don't discriminate, even assuming the number of agencies that don't discriminate were to remain the same if the city were to authorize discrimination. And we have no idea what that would look like. But even so, to say go to another agency, I think that Mrs. Phan, you know, addressed that well. It's never been an answer in our tradition, legal tradition, to say that discrimination is okay as long as you can be, you know, there are other venues that won't discriminate against you. And by referring politely, it doesn't make a difference. If a restaurant owner who discriminated against African-Americans politely said, I can't serve you, but there are restaurants down the block that would, the humiliation, degradation. But the question is, is this really a public accommodation? Well, I think it doesn't matter if this is a public accommodation. I think it is under the terms of the public accommodation ordinance in the city of Philadelphia. I don't see how you could say it's not. And the argument that it's not a public accommodation because race and disability can be considered in making individual placement decisions, you know, that falls apart, because that is not, that doesn't go to the interest in protecting against discrimination. Those are considerations that go to making best interest determinations for each child. In fact, the Americans with Disabilities Act, public accommodation provision, applies to foster care services. And Middle District of Pennsylvania in Dovey County of Center recognized that that applies to the foster care system. But it doesn't matter if it's a public accommodation. Even if the CFS, fair as they say, they didn't understand that provision to apply to it. The city clearly always did and has clarified their contracts to that effect. But even if there were never a provision, once the city learned that there were two agencies, now just one, who were unwilling to accept a class of families, prospective foster families, based on a characteristic that has nothing to do with the ability to care for a child, they were not required to continue to contract with that agency and let them turn away good families. If they had learned an agency was turning away Republicans or Catholics or interracial couples, I don't think anybody would question or assume this was anti-religious targeting to say, hey, wait a minute, we hired you to find families for children who desperately need them. If you're unwilling to accept all qualified families, I'm sorry, we can't continue to contract with you. Thank you very much. Thank you. Ms. Windham. Prior to this case arising, the standard practice was that referrals happened all the time. As soon as Mr. Amato testified to that at the hearing, Deputy Commissioner Ali acknowledged that in some circumstances, such as medical or specialized behavioral health, that referrals were, in fact, appropriate. And so the city, on its own websites, told foster families to find the agency that is the best fit for you, because agencies can have different requirements. You can see that at appendix page 1017. So the city has never had a policy that referrals are somehow unimportant or not prohibited. It has told families to find the agency that's the best fit for you. If I could go back to an area that you talked about, and you had a number of questions, especially from Judge Rendell. How is the city requiring Catholic Social Services to change its views on gay marriage in order to receive a contract? Isn't it really saying that you can't discriminate in the performance of carrying out that contract? Your Honor, the city acknowledged at the hearing, Commissioner Figueroa testified that the city has nothing to do with home studies. This is at the appendix page 532 to 533. How is Commissioner Figueroa or anyone in the city asking CSS to change its views on gay marriage? What the city is asking Catholics to do is to take an action and make a written certification which is inconsistent with Catholics' religious beliefs. I'm not aware of any precedent out there that says it's okay for the government to restrict your religious exercise and burden your religious exercise pursuant to a non-neutral, non-generally applicable law, as long as you say, okay, it's just because the government made me do it. But to flip it, is there anything more simple, direct, plain vanilla than you shall not discriminate in the performance of carrying out a contract? Your Honor, that's not what the contract says. The contract says with regard to race, national origin, and religion, you shall not discriminate. You can see this in 15.1 of the contract. And also sexual orientation. No, Your Honor. With regard to sexual orientation, disability, and a whole host of other protected classes, it says that you must abide by the Fair Practices Ordinance, and we get into the question of public accommodation. And what does the FPO say? I'm sorry? And what does the FPO say, Fair Practices Ordinance? The Fair Practices Ordinance says that if you are public accommodation, then you may not discriminate in the public accommodation on sexual orientation or other protected classes. Does it make any difference if this is or is not a public accommodation? Your Honor, I believe we're going forward, and my understanding is the next 29 contracts are going to have a nondiscrimination provision in them. Is that correct? That's what the city has said. With regard to whatever the city wants to insert in the contract now, they have made clear, and you can see this on the May 7th letter, page 860 of the appendix, that they are changing the language across the board in order to make it impossible for Catholics to continue contracting with the city. This is a poison pill that is put into the contract to ensure that a particular religious exercise by a particular religious group is impermissible. Non-discrimination is a poison pill is what you're saying. I am saying that the way the city has gone about this here, they have made it clear that the reason for changing their contracts is to target and prohibit a particular religious exercise. Well, it hasn't stopped Bethany Christian. And Bethany Christian was willing to change its practice in regard to city pressure. That says nothing about the religious practices and the religious beliefs of Catholic and whether Catholic would be violating its own faith by changing its ways, by creating this policy in order to appease the city. What the city is talking about here with regard to Commissioner Figueroa, and I've emphasized it's not just Commissioner Figueroa's statements we're talking about. But what the city is talking about here is a situation where a city official calls a religious group into her office, calls some leaders from the religious group into her office, tells her, you're really getting it wrong. You don't understand how to interpret your faith. Let me tell you how. And then when they refuse, when they get it wrong, backing that up with them. This was a meeting, right? This was not a public hearing, right? This was a meeting and not a public hearing. But then if she had targeted them for different treatment, that would be one thing. But there was no targeting here for different treatment. It was abide by, we want you to abide by what everybody else is abiding by. And it's trying to persuade them to indeed fall in line with the generally applicable law. As compared to other cases where the conduct has, the speech has led them to target and act in a way that targets religion. The government is expressly changing its contracts and adding these provisions to specifically prohibit Catholics' religious practice. Well, it's to apply non-discrimination provisions to everybody. Which acknowledges that they didn't apply to everyone before, that there was some sort of gap and now they're trying to cover that over. But are you saying now that in light of the Civil Rights Movement and other movements in society that when a city determines that new policies are needed to address changing situations, that they can't do that? Not at all, Your Honor. This wasn't to address religion. It was to address different relationships and different marital customs, which we've come to recognize. What the city is doing here is specifically addressing a particular religious practice. Really? Yes, Your Honor, because they're changing their contract to specifically prohibit Catholics' religious practice. But not just vis-a-vis you, vis-a-vis everyone. Yes, and I'm not aware... It's not a religious practice. It has to do with a type of a marital or cohabiting relationship, does it not? And yet they are changing it across the board in order to make it impossible for Catholics to continue its religious practice. Well, what is it that says they're doing it in order to prevent Catholics from having this service? What is it that says they're changing it in order to do that? The city said in their May 7th letter to Catholic Social Services, they argued that this was something that was impermissible under the contract, but they said any future contracts will be explicit in this regard. They are changing the contract in order to address and to prohibit a particular religious exercise. With regard to Masterpiece, I heard the argument here that it was determinative, that the determinations there were not neutral and generally applicable. It was not, in fact, determinative. The Supreme Court rested its determination there on religious targeting. I have a question, and you can tell me if I'm wrong, but I thought the city had viewed sexual orientation as a protected class for non-discrimination purposes since 1982 and has required all city contracts since 2010 to prohibit sexual orientation discrimination. Am I right on the timing on that? So they have added sexual orientation discrimination to their public care practices ordinance in 1982. In 2010, they added the city charter provision in 8-200 regarding sexual orientation discrimination. That provision actually does not apply here. You can see that on page 1057 of the record, saying that this is a professional services contract not subject to the lowest responsible bidder requirements of section 8-200 of the charter. So following on Judge Sorica's looking at the dates, how can you say that they're changing the contract now in order to prevent traffic if it's been changed and in effect for years? Because the city has acknowledged that it is, the city said, we're changing the contract. The city said any future contract will be explicit in this regard. And with regard to the prior contract, they're trying to enforce it in a way that burdens Catholic religious sexuality. It sounds like they had a policy before. They hadn't completely gone through making sure that that policy was implemented in every contract, and now they're going to make sure that's done. And they are doing that in response to a particular religious practice and to target a particular religious exercise. With regard, I want to turn here for a moment to the RFPA argument, which was discussed in a similar federal statute. The Supreme Court said this is the cry of bureaucrats everywhere. If I have to make an exception for you, I have to make an exception for everybody, therefore no exceptions. The Supreme Court ruled against that 8-0 in the Gonzales v. UDV case. And so the Supreme Court has acknowledged that laws like RFPA, that laws like RFPA can protect religious exercise, and that the importance of those laws is a case-by-case determination of weighing the burdens on religious exercise and then the government's supposed compelling interests. But in Pennsylvania, the view of what religious activity actually constitutes religious exercise is extremely narrow, is it not? It's a little bit higher than under federal law. But when we're talking about a situation where a particular religious ministry would have to be entirely shut down, we're talking about a situation for a foster parent to testify that they would be devastated and they would struggle to continue to carry out their religious calling. But if daycare is not a fundamental exercise to the Catholic faith, it probably wouldn't pass muster, would it? Not really. Your Honor, the Supreme Court in Smith has said that it does not engage in centrality or fundamental considerations of religious exercise. Pennsylvania Supreme Court. Under Pennsylvania law, I believe that this would qualify as a religious exercise. If the court were to rule that this were not fundamental, I believe that that is contrary to both the facts of this case, showing Catholics 100 years of serving foster children in Philadelphia, showing the sacrifices and the work done by the foster parents, something that even the district court acknowledged. All of that is very commendable, and we understand that. But I thought the Pennsylvania Supreme Court talked about daycare services and said they were not fundamental to religious doctrine. If I'm right about that, why wouldn't that apply here to Pennsylvania law? The Richard Clark Methodist case is actually very interesting in comparison to here. What happened in that case was the church was renting out space to a secular daycare and tried to get a zoning exemption, found out it couldn't, and then transformed the secular daycare into a religious daycare and said now this is our religious exercise. And the Pennsylvania Supreme Court or the appeals court said no, that does not qualify. That stands in stark contrast to the century of service we have here, and I think it also answers some of the concerns that the city has raised with regard to RIPPA. This is not a situation where somebody has walked in the door and said I want a contract, here's my list of demands. This is a situation where a longstanding service to the children of Philadelphia is about to be shut off over an unnecessary concern and over unnecessary religious targeting when that simply could continue. Government contracts are not a get-out-of-the-Constitution free card. The Supreme Court recognized this with Trinity Lutheran, a grant program. It recognized this in Umber. This court recognized this in the Allied Contractors of Eastern Pennsylvania case, and this court is going to be considering that again tomorrow when the city of Philadelphia is arguing that the government cannot impose unconstitutional conditions even on a government grant program. And so even in that context, the court must consider and the city must consider what its obligations are under the free exercise clause, under RIPPA, under the establishment clause, and under the free speech clause. With regard to free speech, the city has said that this is under the contract. But at the hearing, Commissioner Figueroa said we had nothing to do with home studies. Before the Supreme Court, in their brief there, the city conceded that certifications in home studies are not expressly funded under the contract because CSS's compensation is based on the number of children in its care rather than on the number of home studies performed. And three justices of the Supreme Court thought that we had an indisputably clear right to relief and would have given us relief on that motion. The city also has no minimum number of home studies that has to be performed in the contract. They do not put guidelines in the contract of how home studies are to be performed. This is carried out under state law. And so the city's attempt now to change its program to subsume the conduct that they want to reach out and prohibit is a violation of AOC where the Supreme Court recognized that you cannot change the definition of a particular program or manipulate it to subsume the challenge. It's still carried out under state law no matter what, right? I'm sorry? It's still carried out, the report, under state law criteria. It's carried out under, yes, criteria that are laid out in Pennsylvania state law. Anything you want to do to sum up? Yes, Your Honor. We've heard a lot today about exactly what precedents that this could set. And I do want to finish by asking the court what precedent it does want to set. Whether it wants to set a precedent that, accepting the intervener's arguments, it would be impossible for states nationwide to be able to contract with religious agencies, even if they want to do so if those agencies have religious requirements. Whether this court wants to set a precedent saying it's okay for government officials to tell faith groups how to interpret their faith and then to penalize them when they get it wrong, to say it's okay for the executive to tweet out whatever he wants and then penalize religious organizations and call for an investigation ignoring due process procedures, and that that's okay. Whether it's okay for the legislative branch to target particular religious groups and call for penalties on them and then for the agencies to carry that out. That is what is at stake in this case. And for those reasons and all those foregoing, we ask that this court reverse the decision below and enter an order directing the district court to grant the preliminary injunction. Thank you. Thank you. Thank you to all counsel. Extremely well presented briefs and argument. You're all to be congratulated. It's a privilege to have you here. I would ask that if you would get together and have a transcript prepared of your argument and to split it evenly 50-50, left side, right side. And again, thank you for being with us today. Thank you.